UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LEONARDO ARMANI, | ) | |
| | ) | |
| Plaintiff, | ) | 13 C 1423 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| KRAFT FOODS GROUPS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Leonardo Armani brought this *pro se* suit against Kraft Foods Group, Inc., alleging race and national origin discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Doc. 25. (Armani initially named other defendants, Docs. 1, 14, but dropped them in the second amended complaint, Doc. 25.) Kraft has moved under Federal Rule of Civil Procedure 56 for summary judgment. Doc. 33. The motion is granted.

**Background**

Consistent with the local rules, Kraft filed a Local Rule 56.1(a)(3) statement of undisputed facts along with its summary judgment motion. Doc. 35. Each factual assertion in the Local Rule 56.1(a)(3) statement cites evidentiary material in the record and is supported by the cited material. *See* N.D. Ill. L.R. 56.1(a) ("The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph."). Also consistent with the local rules, Kraft filed and served on Armani a Local Rule 56.2 Notice, which explains in detail the requirements of Local Rule 56.1. Doc. 37. Although

1

Armani responded to the summary judgment motion, Doc. 40, he failed to file a Local Rule 56.1(b)(3)(B) response to Kraft's Local Rule 56.1(a)(3) statement or a Local Rule 56.1(b)(3)(C) statement of additional facts.

"[A] district court is entitled to decide [a summary judgment] motion based on the factual record outlined in the [parties'] Local Rule 56.1 statements." *Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004) (internal quotation marks and alterations omitted); *see also Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."); *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009) ("[w]e have repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions"); *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809 (7th Cir. 2005) ("we have ... repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1") (alteration omitted). Armani's status as a *pro se* litigant does not excuse him from complying with Local Rule 56.1. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel") (citations omitted); *Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011) ("[t]hough courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules"); *Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) ("strictly enforcing Local Rule 56.1 was well within the district court's discretion, even though Wilson is a pro se litigant")

(citations omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("even pro se litigants must follow rules of civil procedure").

Accordingly, the court will accept as true the facts set forth in Kraft's statement, viewing those facts and inferences therefrom in the light most favorable to Armani. *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 393 (7th Cir. 2009) ("In accordance with a local rule, the district court justifiably deemed the factual assertions in BP's Rule 56.1(a) Statement in support of its motion for summary judgment admitted because Rao did not respond to the statement."); *Cady*, 467 F.3d at 1061; *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); *Koszola*, 385 F.3d at 1108-09; *Smith v. Lamz*, 321 F.3d 680, 682-83 (7th Cir. 2003). That said, the court is mindful that "a nonmovant's failure to … comply with Local Rule 56.1, does not, of course, automatically result in judgment for the movant. The ultimate burden of persuasion remains with [the movant] to show that it is entitled to judgment as a matter of law." *Raymond*, 442 F.3d at 608 (internal citation omitted). The court therefore will recite the uncontroverted material facts in Kraft's Local Rule 56.1(a)(3) statement and then proceed to determine whether, on those facts, Kraft is entitled to summary judgment.

Kraft uses temporary contract workers to supplement its regular employee workforce on an as-needed basis. Doc. 35 at ¶ 7. At all relevant times, Kraft used ContingentSolutions for recruiting, screening, and coordinating logistics for contract workers placed in temporary positions. *Ibid*. Through its arrangement with ContingentSolutions, Kraft did not contact temporary staffing companies or applicants directly; rather, ContingentSolutions communicated

with temporary staffing companies to recruit temporary contract workers for Kraft's temporary positions, and the temporary staffing companies communicated with the potential hires. *Id*. at ¶ 8. Abacus Services Corporation was one of the temporary staffing companies that submitted candidates to ContingentSolutions to be considered for Kraft's temporary positions. *Id*. at ¶ 14.

In July 2012, Mike Onderwater, a senior buyer in Kraft's packaging procurement division, placed orders for two temporary positions in his division with Lauren Sweers, a vendor management specialist for ContingentSolutions. *Id*. at ¶ 10. ContingentSolutions assigned a unique order number, with the prefix "KFTJP" followed by a series of numbers, to each temporary position Kraft sought to fill. *Id*. at ¶ 9. Sweers created an online job posting for each of the two positions that included the order number, position title, job position details, requested bill rate, and maximum bill rate, in response to which temporary staffing companies submitted applicants' resumes. *Id*. at ¶ 11. Order KFTJP00000906 ("KFTJP-906") was for a buyer position, a mid-level supply chain role, while Order KFTJP00000930 ("KFTJP-930") was for a procurement analyst position, a low-level supply chain role. *Id*. at ¶ 12. Both positions had expected durations of approximately five months. *Ibid*. Through ContingentSolutions, Onderwater scheduled interviews of applicants for both positions in late July 2012 with Renee Desbles and Dana Welder, senior managers in Kraft's packaging procurement division. *Id*. at ¶ 26.

In July 2012, Armani applied to Abacus for a temporary position with Kraft by submitting his name, email, phone number, and resume in response to a posting on the CareerBuilder website. *Id*. at ¶ 13. On July 18, 2012, Marilyn Vimmi, a recruiter for Abacus, called Armani for a telephone screening. *Id*. at ¶ 15. Armani understood that while he would be performing services at Kraft, he would be employed by Abacus, which would pay Armani and

4

bill Kraft for Armani's services. *Id*. at ¶¶ 18-19. Following her call with Armani, Vimmi emailed Armani the job description for the KFTJP-930 analyst position and asked him to confirm his interest in applying for that position and to supply additional information, including his expected pay rate. *Id*. at ¶ 16. Armani confirmed that he wanted to apply for the position and that he expected a pay rate of $50 per hour. *Id*. at ¶ 17. After Vimmi explained that $50 per hour was too high for Abacus to make any profit, Armani agreed to $40 per hour. *Ibid*.

Later that day, Vimmi submitted Armani's resume for the KFTJP-906 buyer position rather than for the KFTJP-930 analyst position that Vimmi and Armani had discussed. *Id*. at ¶ 20. Vimmi also sent Armani an email with the subject line "Abacus Confirmation Email—KFTJP00000906 Buyer with Kraft Foods" confirming that Abacus had submitted Armani's resume for the KFTJP-906 buyer position at an agreed-upon pay rate of $40 per hour. *Id*. at ¶ 21. Armani recognized that Abacus had submitted him for a different position (KFTJP-906) than the one he had discussed with Vimmi (KFTJP-930), and that the KFTJP-906 position required a higher skill level than the KFTJP-930 position. *Id*. at ¶ 22. Armani believed he was overqualified for both positions. *Id*. at ¶ 23. On July 19, 2012, Vimmi emailed Armani to inform him that his resume had been "short-listed," and the next day, another Abacus recruiter emailed Armani that he had been selected to interview for the KFTJP-906 buyer position. *Id*. at ¶¶ 24-25.

On July 26, 2012, Desbles and Welder interviewed Armani for the KFTJP-906 buyer position. *Id*. at ¶ 28. Before the interview, Onderwater's wife gave birth to their child, and he went on paid time off to be with his newborn and family. *Id*. at ¶ 27. Desbles and Welder explained to Armani that Onderwater was in charge of filling the position but was not available to attend Armani's interview, so Desbles and Welder were going to make recommendations for

Onderwater to consider. *Id*. at ¶ 29. During the interview, Desbles, Welder, and Armani discussed Armani's resume, pertinent work experience, proficiency with Systems Applications Products ("SAP") software and Excel, and educational background, including his four master's degrees in human resources, business administration, project management, and information systems. *Id*. at ¶¶ 30, 32. Armani had worked as a senior buyer, commodity manager, and SAP consultant for over fifteen years prior to applying to Kraft, and he believed that any position below the level of commodity manager was something he had done and knew how to do. *Id*. at ¶ 31.

Desbles and Welder were impressed by Armani's experience and education, and Welder specifically noted on her copy of Armani's resume that she thought he had a "Great Resume" and "Great SAP Skills," among other positive notes. *Id*. at ¶¶ 33-34. However, Welder also questioned why Armani wanted a temporary position and whether he was overqualified based on his four master's degrees. *Id*. at ¶ 34. Armani testified that Desbles and Welder told him during the interview that they thought he was a good candidate, but that they were not sure where they could place him because there were a number of different temporary positions to fill and they were not yet sure how they would be placing temporary workers. *Id*. at ¶ 36. Armani's bill rate was not discussed during the interview. *Id*. at ¶ 35.

Armani has articulated four slightly different versions of a conversation that occurred during or shortly after his interview. *Id*. at ¶¶ 37-41. First, Armani testified during his deposition that Desbles, Weber, and Armani had a "little talk" after the interview and before Armani left the interview room, during which Desbles conversationally asked, "Are you from Italian descent, like your name is catchy, Leonardo Armani?" *Id*. at ¶ 37. Armani responded no, Desbles and Weber asked where he was from, and Armani said he was from Jordan. *Ibid*. The

6

three then shook hands and Armani departed. *Ibid*. Second, Armani testified during his deposition that Desbles asked one of two questions—"is Leonardo Armani Italian" or "are you Italian"—and he responded no. *Id*. at ¶ 38. She then asked "where are you from" or "what's your ethnic background," Armani responded that he was from Jordan, and Desbles responded, "oh, okay." *Ibid*. Third, Armani testified during his deposition that Desbles asked him at the interview about "[t]he accent, about the Italian background or are you Italian or if your accent is Italian or something in that regard." *Id*. at ¶ 40. Fourth, Armani submitted a written statement asserting that Desbles "concluded her interview with her curiosity to what accent am I speaking? Or if I was from an Italian De[s]cent?" *Id*. at ¶ 39. Armani testified that the written account is "what really happened," and that he believes that Kraft withdrew its offer to him because of his national origin. *Id*. at ¶¶ 41, 43.

On July 30, 2012, Onderwater returned from paid time off and met with Desbles and Welder to discuss the applicants they had interviewed for the buyer and analyst positions. *Id*. at ¶ 46. Desbles and Welder recommended Armani for the KFTJP-906 buyer position and Veronica Garcia for the KFTJP-930 analyst position. *Id*. at ¶ 47. Later that day, Onderwater contacted Sweers and authorized her to extend offers to Armani and Garcia for those positions. *Id*. at ¶ 49. Onderwater did not know Armani's national origin when he authorized Sweers to extend Armani an offer, and Onderwater had no direct communications with Abacus or any other temporary staffing company, or with Armani or any other applicant, regarding the two positions. *Id*. at ¶¶ 50, 55. Sweers emailed Melissa Fregonara of Abacus that day to communicate Kraft's offer to Armani, and Fregonara forwarded the email to Krystin Guerriero, an Abacus account manager who oversaw Abacus's submissions of candidates for Kraft's temporary positions. *Id*. at ¶ 51. The same day, Guerriero emailed Armani to communicate Kraft's offer and ask him to

7

complete the onboarding process, which included an Abacus employment application and a Kraft temporary employee acknowledgment. *Id*. at ¶ 52. In an effort to obtain a higher pay rate, Armani bluffed that he already had a competing job offer that would pay him more, and he and Guerriero ultimately agreed on a $43 per hour pay rate, with the understanding that Abacus would bill Kraft at a higher rate and then pay Armani $43 per hour. *Id*. at ¶ 53. Guerriero communicated Armani's acceptance to Sweers, who notified Onderwater that Armani had accepted the KFTJP-906 buyer position. *Id*. at ¶ 54. Armani never communicated directly with Onderwater and did not take part in any communications among Desbles, Welder, and Onderwater. *Id*. at ¶ 45.

On July 31, 2012, Onderwater viewed the job posting for the KFTJP-906 buyer position, which listed a "requested bill rate" of $70 per hour in the top left column. *Id*. at ¶ 56. Onderwater mistakenly believed that this was Armani's bill rate, when in fact the actual bill rate was the "max bill rate" of $56 per hour located in the lower right corner of the job posting. *Id*. at ¶¶ 56, 76. A bill rate of $70 per hour exceeded the packaging procurement division's budget for the KFTJP-906 position. *Id*. at ¶ 57. Onderwater told Desbles and Welder about what he believed to be Armani's $70 per hour bill rate, and they agreed that it was too high for the position. *Id*. at ¶ 58. Welder also noted the $70 per hour bill rate on her hard copy of Armani's resume. *Id*. at ¶ 59. That same day, between 10:59 a.m. and 11:05 a.m., Onderwater sent three emails to Sweers stating that he needed to speak with her about the bill rates and asking whether Armani and Garcia would accept lower rates. *Id*. at ¶ 60. When Onderwater spoke to Sweers later that day, he explained that they needed to reduce the scope of the KFTJP-906 buyer position to be more tactical and administrative, akin to a senior procurement analyst position, so that the role would align with a lower bill rate. *Id*. at ¶ 61. Onderwater decided that because he

had restructured the KFTJP-906 position to a lower level, Armani was both overqualified and too expensive for the position. *Id*. at ¶ 62. Onderwater authorized Sweers to withdraw Armani's offer. *Ibid*. Onderwater did not know Armani's national origin when he authorized the withdrawal of Armani's offer, and neither Desbles nor Welder participated in the decision to withdraw the offer. *Id*. at ¶¶ 63-64. Sweers notified Guerriero via email that Kraft had withdrawn Armani's offer, stating: "The hiring managers are going to be changing the role Leo has accepted. They now feel he would not be a good fit for the role." *Id*. at ¶ 65.

On August 1, 2012, Guerriero called Armani to notify him of the withdrawal of his offer. *Id*. at ¶ 66. Guerriero did not discuss Armani's bill rate during the call. *Id*. at ¶ 67. Armani responded that the withdrawal was unfair and that he was going to file a charge with the EEOC. *Id*. at ¶ 66. He also asked Guerriero to follow up with the hiring manager for the exact reason that his offer was withdrawn. *Ibid*. Guerriero emailed Sweers asking for further explanation, and Sweers responded: "They changed the role significantly due to a last minute change in their needs. The role is now more tactical and administrative. They wanted me to communicate that if another opening came available that Leo would be a good fit for they would be interested. They were very impressed with him." *Id*. at ¶ 68. Guerriero then emailed Armani to tell him that "the manager at Kraft made this decision" and that she had also "included the message from the rep who made [Guerriero] aware of the decision made by the manager." *Id*. at ¶ 69. Guerriero then combined Sweers' messages into one statement that Guerriero said was "from the representatives at Kraft":

> The hiring managers are going to be changing the role Leo has accepted. They now feel he would not be a good fit for the role. They changed the role significantly due to a last minute change in their needs. The role is now more tactical and administrative. They wanted me to communicate that if another opening came available that Leo would be a good fit for they would be interested. They were very impressed with him.

*Ibid*. Armani believed that the phrase "from the representatives at Kraft" referred to Desbles, Welder, or Onderwater. *Id*. at ¶ 70. Armani did not know about ContingentSolutions's role in Kraft's placement of workers in temporary positions until he obtained and reviewed the file of the EEOC's investigation of his charge. *Id*. at ¶ 71. Armani admitted that no one employed by Kraft or Abacus told him that he was not hired for the position because he is from Jordan. *Id*. at ¶ 75.

After Onderwater restructured the KFTJP-906 buyer position, he believed that Garcia, who was originally selected for the KFTJP-930 procurement analyst position, was a better fit than Armani for the KFTJP-906 position because her bill rate was $50 per hour and she had the appropriate level of supply chain experience for the position. *Id*. at ¶ 77. On August 1, 2012 Onderwater authorized Sweers to offer Garcia the revised KFTJP-906 buyer position, and Garcia accepted. *Id*. at ¶ 78. Armani believed that the position that he had been offered remained open because he continued to see postings with vague job descriptions and titles for supply chain positions, but he did not receive any communication from Kraft about open positions or any communications bearing the KFTJP-906 order number. *Id*. at ¶ 79. He also believed that the position may have been filled based on a LinkedIn profile that he found. *Ibid*.

Onderwater honestly and in good faith believed that Armani's bill rate was $70 per hour, and he did not realize his mistake until after Armani filed his EEOC charge. *Id*. at ¶ 76. Guerriero did not offer to submit Armani for any other open positions with Kraft, and Armani never applied to any other open positions with Kraft. *Id*. at ¶ 73.

## Discussion

Race and national origin discrimination claims under Title VII and § 1981 are analyzed under the same framework, so the court will simplify the discussion by referring only to Title VII

doctrine and precedents. *See Smith v. Bray*, 681 F.3d 888, 895-96 & n.2 (7th Cir. 2012); *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010) ("The same requirements for proving discrimination apply to claims under Title VII, § 1981, and § 1983."). A Title VII plaintiff may seek to defeat summary judgment under the direct and indirect methods of proof. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012); *Rodgers v. White*, 657 F.3d 511, 516-17 (7th Cir. 2011). The court will consider whether Armani can defeat summary judgment under either method, with the relevant facts being those set forth in Kraft's Local Rule 56.1(a)(3) statement. *See Koszola*, 385 F.3d at 1109 ("a district court is entitled to decide the motion based on the factual record outlined in the Local Rule 56.1 statements") (brackets and internal quotation marks omitted).

"Under the 'direct method,' the plaintiff may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Coleman*, 667 F.3d at 845. The appropriate focus under the direct method "is not whether the evidence offered is direct or circumstantial but rather whether the evidence points directly to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal quotation marks omitted); *see also Everett v. Cook Cnty.*, 655 F.3d 723, 729 (7th Cir. 2011); *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 672 (7th Cir. 2011). "Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. In short, direct evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citations and internal quotation marks omitted); *see also Coleman*, 667 F.3d at 860; *Everett*, 655 F.3d at 729; *Diaz v. Kraft Foods Global, Inc.*, 653

F.3d 582, 587 (7th Cir. 2011). Not surprisingly, Kraft's Local Rule 56.1(a)(3) statement contains no facts that could constitute direct evidence of race discrimination.

"A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker. That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Rhodes*, 359 F.3d at 504 (citations and internal quotation marks omitted); *see also Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014); *Perez v. Thorntons, Inc.*, 731 F.3d 699, 710 (7th Cir. 2013); *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012); *Everett*, 655 F.3d at 729 (explaining that circumstantial evidence is "evidence that points to discriminatory animus through a longer chain of inferences"). Circumstantial evidence typically falls into one of three categories: "(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Diaz*, 653 F.3d at 587; *see also Chaib*, 744 F.3d at 982; *Perez*, 731 F.3d at 711; *Coleman*, 667 F.3d at 860; *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011).

Kraft's Local Rule 56.1(a)(3) statement contains no circumstantial evidence that Kraft acted in a discriminatory fashion. Armani's brief contends that "the entire events of selecting, interviewing, offering the position and withdrawal of the offer might happened with [the decision-maker's] presence," and that "a logical explanation [is] that interviewe[r]s are the real decision makers, regardless of the job creation author." Doc. 40 at 5. These contentions are unpersuasive because the interviewers were *aware* of Armani's race and national origin when

12

they *recommended* him for the position, and Onderwater was *unaware* of Armani's race or national origin when he *withdrew* the offer. Given this, the fact that Armani's national origin was mentioned at his interview and that Kraft withdrew Armani's offer two days after making it cannot give rise to an inference that the offer was withdrawn on the basis of his race or national origin, and there is no record evidence that might cast these racially neutral incidents in a racially charged light.

The absence from the record of any of the sort of direct or circumstantial evidence necessary to prevent summary judgment under the direct method relegates Armani to the indirect method articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-05 (1973). The indirect method has three steps. The plaintiff first must make a prima facie case of discrimination, which requires him to establish that (1) he is a member of a protected class, (2) he was qualified for an open position for which he applied, (3) his application was rejected, and (4) either another similarly situated individual who was not in the protected class was placed in the position, or the position remained open and the employer continued to seek applicants from persons of the plaintiff's qualifications. *See Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 431 (7th Cir. 2010). If the plaintiff makes a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant articulates such a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff, who must provide evidence that the defendant's stated reason is pretextual. *Id.* at 804-05. "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Silverman*, 637 F.3d at 743-44 (brackets and internal quotation marks omitted).

Armani's case fares no better under the indirect method than under the direct method. Even if Armani has established a prima facie case of discrimination, the facts set forth in Kraft's Local Rule 56.1(a)(3) statement and recounted at length above reveal that Onderwater withdrew Armani's offer because he mistakenly believed that Armani's bill rate was $70 per hour, which was too high for the position. Armani argues that he never asked for a $70 per hour rate, and that Kraft's explanation is not a "logical argument to justify the alleged good faith." Doc. 40 at 4. However, the fact that Kraft made a mistake does not render its explanation pretextual or its withdrawal of Armani's offer discriminatory. "[N]either in ordinary language nor in the law does [pretext] mean a mistake. It means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995); *see also Silverman*, 637 F.3d at 738-39 (same); *Stockwell v. City of Harvey*, 597 F.3d 895, 907 (7th Cir. 2010) ("Although Chief Bell may have been mistaken in the conclusions drawn from Mr. Stockwell's statements, [a] reason honestly described but poorly founded is not a pretext, as that term is used in the law of discrimination.") (internal quotation marks omitted, alteration in original); *Bruno v. City of Crown Point*, 950 F.2d 355, 364 (7th Cir. 1991) ("An employer's decision does not have to be wise, prudent or logical; it merely has to be explained clearly and applied indiscriminately."); *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir. 1987) ("No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII and § 1981 do not interfere."). While a mistake might conceivably qualify as pretext under some circumstances, the record here provides no factual basis that could lead the court to conclude that Kraft was lying about its rationale for withdrawing its offer to Armani, particularly as there is no evidence that Onderwater, the decisionmaker who made the mistake in question and who withdrew Armani's offer, had any knowledge of Armani's race or

national origin when he did so.  *See Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) ("A mere mistake by an employer does not constitute pretext; instead, pretext is a phony excuse. … [T]he court will not reexamine business decisions as a super-personnel department; instead, the important consideration is whether the employer gave an honest explanation of its behavior.") (internal quotation marks omitted); *Reeder-Baker v. Lincoln Nat'l Corp.*, 834 F.2d 1373, 1381 (7th Cir. 1987) ("If you honestly explain the reasons behind your decision, but the decision was ill-informed or ill-considered, your explanation is not a pretext ….") (internal quotation marks omitted).  Armani therefore cannot forestall summary judgment under the indirect method.

## Conclusion

Because Armani does not satisfy either the direct or indirect methods, Kraft's motion for summary judgment is granted.

June 4, 2014

United States District Judge